Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                                    Docket No.: _____(      )

                                        Plaintiffs,

            -against-


PARK CHEMISTS 4 AV LLC, PARK CHEMISTS LLC,
MODERN REMEDIES LLC, GARY VALEVICH, IRINA
VALEVICH, ELISHA KOHANBASH, RACHEL
LEVIHAIEM AND JOHN DOE NOS. "1" THROUGH
"10",

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Park Chemists 4 Av LLC ("Park

Chemists 4 Av"), Park Chemists LLC ("Park Chemists"), Gary Valevich ("G. Valevich"), Irina

Valevich ("I. Valevich "), Modern Remedies LLC ("Modern Remedies"), Elisha Kohanbash

("Kohanbash"), Rachel Levihaiem ("Levihaiem"), and John Doe Nos. "1" through "10" (the "John Doe Defendants") (collectively, "Defendants"), hereby allege as follows:

1.      GEICO brings this action to terminate an ongoing fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $3.6 million in fraudulent pharmaceutical claims. The Defendants' scheme primarily targeted expensive topical prescription drug products, which they systematically dispensed to individuals involved in automobile accidents without regard for genuine patient care. The Defendants intentionally targeted topical drug products solely based on the medications' high profit margins. As part of the fraudulent scheme and to maximize their profits, the Defendants paid unlawful kickbacks or provided other financial incentives in exchange for large volumes of medically unnecessary and often invalid, prescriptions steered to Park Chemists 4 Av, Park Chemists and Modern Remedies (collectively, the "Pharmacies").

2.      The fraudulent scheme began in 2022 when the Defendants joined a network of individuals regularly involved in No-Fault insurance fraud who could facilitate illegal, collusive arrangements that resulted in large volumes of fraudulent pharmaceutical claims billed to GEICO and other New York automobile companies. The Pharmacies purport to be neighborhood pharmacies operating in Brooklyn, New York but in fact, have been used by Defendants G. Valevich, I. Valevich, Kohanbash, and Levihaiem, along with the John Doe Defendants, as part of a scheme to exploit patient for financial gain by overwhelmingly targeting Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidothol 4.5-5% Patches (the "Lidothol Patches") (collectively, the "Fraudulent Topical Pain Products"), as well as various other prescription drug medications (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals"). The

Fraudulent Pharmaceuticals were dispensed to individuals involved in automobile accidents and eligible for insurance coverage under police of insurance issued by GEICO (the "Insureds")

3.      The Defendants submitted over $3.4 million in fraudulent pharmaceutical charges to GEICO for the Fraudulent Topical Pain Products alone. Specifically, the Pharmacies billed GEICO more than $1.6 million for Diclofenac Gel 3%, typically charging from $1,887.20 to $2,363.50 per prescription; nearly $1 million for Lidocaine 5% Ointment, typically charging from $1,522.00 to $1,909.25 per prescription; and over $776,000.00 for Lidothol Patches, typically charging from $2,383.80 to $2,984.40 per prescription. The Pharmacies' billing regularly included multiple charges per Insured for these exorbitantly priced Fraudulent Topical Pain Products, thereby further inflating the charges submitted to GEICO.

4.      As part of the fraudulent scheme, the Defendants engaged in collusive agreements with various prescribing healthcare providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), paying them kickbacks and other financial incentives to direct large volumes of prescriptions – or purported prescriptions – for the Fraudulent Pharmaceuticals to the Pharmacies. These prescriptions – to the extent they were even legitimately issued in the first place – frequently included invalid pre-printed "check-list type" prescription order forms, "telephone prescriptions," and electronic prescriptions that failed to comply with New York law yet were used by the Pharmacies as the basis to dispense and bill for large volumes of Fraudulent Pharmaceuticals.

5.      The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to the patients' health, safety, and well-being. For example, the Defendants dispensed large volumes of Fraudulent Topical Pain Products classified

as "unapproved" drugs by the United States Food and Drug Administration ("FDA") in the form of Lidothol Patches. The Defendants also often dispensed multiple pharmaceuticals from the same therapeutic class, on the same date to a single Insured, despite obvious clinical abuse and risk of therapeutic duplication, solely to maximize their billing.

6.      By this action, GEICO seeks to recover more than $136,300.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacies of over $3,175,200.00 in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted through the Pharmacies because:

(i)      the Defendants billed for Fraudulent Pharmaceuticals, which were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

(iv)     the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid and duplicitous prescriptions.

7.      The Defendants fall into the following categories:

(i)      The Pharmacies – Park Chemists 4 Av, Park Chemists, and Modern Remedies – are New York limited liability companies that engaged in a fraudulent scheme in which they dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers

claims for reimbursement of No-Fault Benefits to which they were not entitled;

(ii) G. Valevich, I. Valevich, Kohanbash, and Levihaiem, (the "Pharmacy Owners") are the purported owners of the Pharmacies, with G. Valevich and I. Valevich purporting to co-own Park Chemists 4 Av and Park Chemists, and Kohanbash and Levihaiem purporting to co-own Modern Remedies;

(iii) John Doe Nos. "1" through "10" (i.e., the John Doe Defendants) are persons and entities, presently not identifiable, who along with the Defendants, participated in the operation and control of the Pharmacies, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers.

8. The Defendants' scheme began in 2022. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

9. Based on the foregoing, the Pharmacies do not now have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to Insureds.

10. The charts attached hereto as Exhibits "1"-"3" set forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through the Pharmacies using the United States mail.

11.	As a result of the Defendants' scheme, GEICO has incurred damages of approximately $136,300.00.

## THE PARTIES

### I.	Plaintiffs

12.	Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.	Defendants

13.	Defendant Park Chemists is a New York limited liability company, formed on or about November 6, 2013, with its principal place of business at 164 5th Avenue, Brooklyn, New York.

14.	Defendant Park Chemists was first registered with the New York State Department of Education, Office of Professions on April 7, 2014.

15.	Defendant Park Chemists 4 Av is a New York limited liability company, formed on or about October 11, 2017, with its principal place of business at 500 4th Avenue, Brooklyn, New York.

16.	Defendant Park Chemists 4 Av was first registered with the New York State Department of Education, Office of Professions on February 14, 2019.

17.	Defendant G. Valevich resides in and is a citizen of New York and is one of the two purported members and co-owners of both Park Chemists and Park Chemists 4 Av.

18.	Defendant I. Valevich resides in and is a citizen of New York, and is one of the two purported members and co-owners of both Park Chemists and Park Chemists 4 Av.

19.     Defendant Modern Remedies is a New York limited liability company, formed on or about July 17, 2017, with its principal place of business at 2823 Nostrand Avenue, Brooklyn, New York.

20.     Modern Remedies was first registered with the New York State Department of Education, Office of Professions on January 16, 2018.

21.     Defendant Kohanbash resides in and is a citizen of New York and is one of the two purported members and co-owners of Modern Remedies.

22.     Defendant Levihaiem resides in and is a citizen of New York and is one of the two purported members and co-owners of Modern Remedies.

23.     The John Doe Defendants are individuals and entities, presently not identifiable, who, along with the Defendants, participated in the operation and control of the Pharmacies, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, and who, upon information and belief, reside in and are citizens of New York.

24.     Beginning in 2022, the Pharmacy Owners, together with the John Doe Defendants, began using the Pharmacies to submit fraudulent pharmaceutical billing to GEICO.

25.     The billing from each of the Pharmacies was mailed from their locations in Brooklyn, New York with directions to insurers to send payments to one of two addresses in Brooklyn associated with Korsunskiy Legal Group P.C., 1674 East 22 Street, 2nd Floor, Brooklyn, New York or 2626 East 14th Street, Suite 201, Brooklyn, New York.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

27.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

28.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

30.     GEICO underwrites automobile insurance in the State of New York.

31.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 165 et seq.)(collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

32.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

33.     The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

34.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

35.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

36.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

37.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

38.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Laws

39.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

40.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

41.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

42.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication,

drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

43. New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

44. New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

45. New York Education Law § 6512, § 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

46. New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for financial gain of the licensee or of a third party.

47. New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

48. New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

49.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

### III.     The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

####     A.     Overview of the Scheme

50.     Beginning in 2022, and continuing uninterrupted through the present day, the Defendants implemented a fraudulent scheme in which they used the Pharmacies to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Pharmaceuticals purportedly dispensed to Insureds.

51.     Park Chemists 4 Av, Park Chemists and Modern Remedies present themselves as three independent, locally-owned neighborhood pharmacies operating in and catering to the local community in Brooklyn, New York, when in fact, the Defendants used the Pharmacies as part of a large-scale, integrated fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally disregarding a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

52.     In fact, in 2022, the Pharmacy Owners joined a network of individuals and entities regularly involved in No-Fault insurance fraud who were familiar with the No-Fault Clinics and could arrange for fraudulent claims to be billed and collected as quickly as possible from New York automobile insurance companies to generate large profits without regard to genuine patient care.

53.     Upon joining the network in 2022, which included a collection law firm, a purported No-Fault billing company, and a purported pharmaceutical delivery company, all

located in Brooklyn, New York, the Defendants began targeting and receiving large volumes of prescriptions for the Fraudulent Pharmaceuticals.

54.     In May 2022, the Defendants began using Park Chemists 4 Av and thereafter, Park Chemists to exploit the New York No-Fault insurance system by intentionally focusing on and targeting a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) to dispense to Insureds.

55.     In September 2022, the Defendants, not content with submitting fraudulent billing through Park Chemists 4 Av and Park Chemists, also began using Modern Remedies to exploit Insureds for financial gain by focusing on and targeting the Fraudulent Topical Pain Products and increasing the volume of fraudulent billing submitted to GEICO.

56.     In keeping with the fact that the Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to GEICO, the Pharmacies overwhelmingly dispensed and billed for three exorbitantly priced topical products, namely, Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidothol Patches.

57.     The Defendants chose these products – Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidothol Patches (containing Lidocaine) – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves.  Moreover, the Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws.

58.     Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services has noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See,

<u>Questionable Billing For Compounded Topical Drugs in Medicare Part D</u>, OEI-02-16-00440 (August 2018).

59.     Similarly, Lidothol Patches have been subject to fraud and abuse as it is sourced from a company not properly registered in New York as a drug supplier or manufacturer and is classified by the FDA as an "unapproved drug" not reviewed for safety, effectiveness, or quality. Yet, the Defendants targeted and billed for Lidothol Patches because it is exponentially more expensive than many commercially available, FDA approved pain patches.

60.     The onset of the Defendants' scheme in 2022 resulted in each of the Pharmacies suddenly receiving voluminous prescriptions from the Prescribing Providers and Clinic Controllers who work at or are associated with various No-Fault Clinics, despite doing no legitimate advertising, marketing or outreach to generate referrals of prescriptions to the Pharmacies from the Prescribing Providers that treat automobile accident victims at the No-Fault Clinics.

61.     In all the years preceding 2022, Park Chemists 4 Av submitted no billing whatsoever to GEICO, Park Chemists submitted less than $9,000.00 in billing, and Modern Remedies submitted less than $18,000.00 in billing.

62.     By contrast, beginning in May 2022, Park Chemists 4 Av submitted more than $100,000.00 in billing to GEICO in the first 60 days after the onset of the billing and more than $1,600,000.00 in billing to GEICO over 16 months. Beginning in September 2022, Modern Remedies submitted more than $225,000.00 in billing to GEICO in the first 60 days after the onset of the billing and more than $1,200,000.00 in billing to GEICO over eight months.  Beginning in March 2023, Park Chemists submitted more than $190,000.00 in billing to GEICO in the first 60 days after the onset of the billing and more than $712,000.00 in billing to GEICO over six months.

63.     To date, more than 95% of each of the Pharmacies' billing to GEICO since 2022 has been for the Fraudulent Topical Pain Products purportedly dispensed to Insureds.

64.     The sudden, huge increase in billing from the Pharmacies for the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals coincided with the Defendants' engagement of the Korsunskiy Legal Group, P.C., Green Bills LLC and Drug Lift Corp., and the Defendants' collusion with the Prescribing Providers and Clinic Controllers, in which the Defendants steered them to prescribe and direct large volumes of prescriptions to the Pharmacies for specifically targeted Fraudulent Pharmaceuticals, which were purportedly prescribed and dispensed to patients at the No-Fault Clinics.

65.     Upon information and belief, the Brooklyn-based collection law firm, billing company, and pharmaceutical delivery company, assisted with the targeting of the Fraudulent Pharmaceuticals, the billing submitted to insurance companies and the collections of the proceeds of the bills, along with facilitating the "factoring" of the Pharmacies' accounts receivables through one or more companies associated with them.

66.     The "factoring" of No-Fault bills and receivables is often used to generate money to pay kickbacks to the Prescribing Providers and Clinic Controllers, support the submission of large volumes of fraudulent claims, and allow "funders" to illegally participate in profiting from healthcare services and/or goods through the assignment of the providers' receivables in exchange for the "funding."

67.     Here, the Defendants' scheme to pay kickbacks for patient referrals ensured that the Prescribing Providers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to each of the Pharmacies.  In fact, four of the top six Prescribing Providers that issued prescriptions – or purported to issue prescriptions – that were dispensed by Park Chemists

4 Av also issued numerous prescriptions – or purported to issue prescriptions – that were dispensed by Park Chemists, while six of the top Prescribing Providers that issued prescriptions – or purported to issue prescriptions – that were dispensed by Park Chemists 4 Av also issued numerous prescriptions – or purported to issue prescriptions – that were dispensed by Modern Remedies.

68.     Moreover, Park Chemists 4 Av, Park Chemists, and Modern Remedies were used interchangeably by the Defendants to steer prescriptions from the Prescribing Providers and Clinic Controllers to the Defendants in exchange for kickbacks. In fact, Park Chemists 4 Av, Park Chemists and Modern Remedies typically billed GEICO using the same exact form of billing receipt and delivery receipt, with Park Chemists 4 Av and Modern Remedies billing and purportedly dispensing overlapping prescriptions to at least 80 of the same Insureds, which prescriptions were often excessive and duplicative. For example:

- Insured SR was allegedly involved in an accident on June 7, 2022, and purportedly received treatment from Wei Hong Xu, NP ("Xu NP") of Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical"). On June 28, 2022 and August 16, 2022, Xu NP purported to issue prescriptions to the Insured for Diclofenac Gel 3%, which prescriptions were both dispensed by Park Chemists 4 Av. On September 19, 2022, Xu NP purported to issue a prescription to the Insured for Lidocaine 5% Ointment, which prescription was dispensed by Modern Remedies. *On that same day*, September 19, 2022, Xu NP also purported to issue a prescription to the Insured for Diclofenac Gel 3%, which prescription was dispensed by Park Chemists 4 Av.

- Insured DB was allegedly involved in an accident on September 15, 2022, and purportedly received treatment from Xu NP of Atlantic Medical. On September 20, 2022, Xu NP purported to issue four prescriptions to the Insured for Lidocaine 5% Ointment, Celebrex 200 mg, Tizanidine 4 mg, and Esgic 50-325-40 mg oral tablets, which prescriptions were dispensed by Park Chemists 4 Av. *Two days later*, on September 22, 2022, Xu NP purported to issue four prescriptions to the Insured *for the exact same products*, Lidocaine 5% Ointment, Celebrex 200 mg, Tizanidine 4 mg, and Esgic 50-325-40 mg oral tablets, which prescriptions were dispensed by Modern Remedies.

- Insured BW was allegedly involved in an accident on May 5, 2022, and purportedly received treatment Xu NP of Atlantic Medical. On August 8, 2022, Xu NP purported to issue a prescription to the Insured for Diclofenac Gel 3%, which prescription was dispensed by Park Chemists 4 Av. On September 19, 2022, Xu NP purported to issue three prescriptions to the Insured for Lidocaine 5% Ointment, Tizanidine 4 mg, and Esgic 50-

325-40 mg oral tablets, which prescription were dispensed by <u>Modern Remedies.</u> *On that same day*, September 19, 2022, Xu NP purported to issue a prescription to the Insured for Diclofenac Gel 3%, which prescription was dispensed by <u>Park Chemists 4 Av</u>.

- Insured JM was allegedly involved in an accident on September 30, 2022, and purportedly received treatment from Hong Sik Pak, M.D. ("Dr. Pak") of Pelham Parkway Medical PC ("Pelham Parkway Medical"). On October 3, 2022, Dr. Pak purported to issue a prescription to the Insured for Lidothol Patches, which prescription was dispensed by <u>Park Chemists 4 Av</u>. On November 8, 2022, November 16, 2022, and December 7, 2022, Dr. Pak purported to issue prescriptions to the Insured for Celecoxib 200 mg, Lidocaine 5% Ointment, and Lidothol Patches, which prescriptions were dispensed by <u>Modern Remedies</u>.

- Insured PM was allegedly involved in an accident on September 30, 2022, and purportedly received treatment from Dr. Pak of Pelham Parkway Medical. Dr. Pak purported to issue a prescription to the Insured for Lidothol Patches, which prescription was dispensed by <u>Park Chemists 4 Av</u> on October 27, 2022 (though no prescription was submitted by Park Chemists 4 Av to GEICO with its bill). *Seven days later*, on November 3, 2022, Dr. Pak purported to issue a prescription to the Insured *for the same exact product*, Lidothol Patches, which prescription was dispensed by <u>Modern Remedies</u>.

69. The Defendants' integrated scheme to dispense the Fraudulent Pharmaceuticals in large volumes through multiple pharmacies using kickbacks for patient referrals ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to one of the Pharmacies regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribing Providers' practices and (ii) the fact that that there were countless other pharmacies located much closer to the Insureds' residences.

70. In fact, more than 76% of the Insureds that allegedly received pharmaceuticals dispensed by Park Chemists, more than 75% of the Insureds that allegedly received pharmaceuticals dispensed by Park Chemists 4 Av, and more than 73% of the Insureds that allegedly received pharmaceuticals dispensed by Modern Remedies lived outside of Brooklyn, New York where those pharmacies are located, with the Insureds who received pharmaceuticals from all three Pharmacies having residences scattered throughout Queens, Bronx, Manhattan,

Westchester, Staten Island, and other distant locations, such as Dutchess, Orange, Albany, and Ulster counties located many miles away from the Pharmacies.

71.     The prescriptions for the Fraudulent Topical Pain Products were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, excessive healthcare services and goods, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements. Further, the Fraudulent Topical Pain Products themselves often had no proven efficacy beyond what an OTC equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

72.     But for the Defendants' illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, the Insureds would not have received the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals purportedly dispensed by the Pharmacies, and further would not have received these products from a pharmacy that is located in a county or city outside of their place of residence.

73.     Instead, the Prescribing Providers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies, irrespective of the pharmacies' inconvenient location to the Insureds' residences or the Prescribing Providers' practices, because the prescriptions were being issued pursuant to illegal, collusive agreements.

74.     The Defendants implemented their pharmaceutical fraud scheme involving the Prescribing Providers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing

from the Pharmacies to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds through the Pharmacies with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

>        **B.**        **The Fraudulent and Invalid Prescriptions**

75.     To facilitate the steering of large volumes of prescriptions for the targeted Fraudulent Pharmaceuticals to the Pharmacies, the Defendants arranged for the use of various forms of illegal, invalid, and duplicitous prescriptions that they used as a purported basis to dispense large volumes of Fraudulent Pharmaceuticals in a predetermined, protocol fashion without regard to genuine patient care.

76.     As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that virtually all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

77.     In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official serialized New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.  See N.Y. Public Health Law § 281; see also N.Y. Education Law § 6810(8).

78.     The limited exceptions to the electronic prescription requirement include: (i) temporary technological or electronic failure; (ii) a waiver granted to the prescriber by the New

York State Commissioner of Health; (iii) a determination by the prescriber that it would be impractical for patients to receive prescriptions in a timely manner if prescribed electronically; or (iv) the prescription will be dispensed by a pharmacy outside of New York State. See N.Y. Public Health Law § 281.

79. The Defendants received and dispensed large numbers of prescriptions that violated the prescribing requirements set forth by New York law in multiple ways, to the extent the prescriptions were even authorized at all by the Prescribing Providers.

80. For example, the Defendants purported to obtain numerous prescriptions by telephone, often submitting with the bills computer images of purported prescription forms with the words "Telephone Rx" on the side of the image.

81. Telephone prescriptions are inconsistent with New York's electronic prescribing laws which only allow oral prescriptions in extremely limited circumstances, such as where there is a temporary electronic failure of the electronic prescribing system or where a practitioner determines that an electronic prescription cannot be issued in a timely manner risking patient harm. See e.g., https://www.health.ny.gov/professionals/narcotic/electronic_prescribing/.

82. Given the limitations on oral prescriptions in New York, it is highly unlikely – to the point of impossibility – that ostensibly separate Pharmacies, like Park Chemists 4 Av and Modern Remedies, would legitimately receive large numbers of prescriptions from different healthcare providers at different No-Fault Clinics via telephone orders for large volumes of the same Fraudulent Pharmaceuticals. Upon information and belief, many, if not all, of the "telephone" prescriptions submitted by the Defendants were unauthorized by the Prescribing Provider.

83. In fact, it appears that the Defendants often purported to obtain oral prescriptions by telephone but actually dispensed the Fraudulent Pharmaceuticals in protocol fashion based on

pre-printed "check-list type" fax prescription order forms (the "Fraudulent Prescription Forms"). The Fraudulent Prescription Forms are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

84.     The Fraudulent Prescription Forms contain the names of the Fraudulent Pharmaceuticals and the quantity in which they were to be prescribed and dispensed to Insureds, along with a preprinted, generic "Statement of Medical Necessity" that is non-sensical and holds no pharmacologic validity. For example, the preprinted, generic "Statement of Medical Necessity" asserts, among other things, that topical pain products were necessary to avoid side effects of orally administered medications, and to lower doses of and prevent dependence on oral medications. Yet, the Prescribing Providers often recommended the Insureds continue taking oral medications, including NSAIDs, and/or prescribed additional oral medications contemporaneously to prescribing the Fraudulent Topical Pain Products.

85.     In many instances, Park Chemists 4 Av actually submitted the Fraudulent Prescription Forms with its billing along with computer images of purported "telephone" prescriptions. Upon information and belief, Modern Remedies purported to fill "telephone" prescriptions that were in many instances actually Fraudulent Prescription Forms, similar to Park Chemists 4 Av, but it did not submit the pre-printed forms with its billing to conceal the use of the Fraudulent Prescription Forms. A sample of the Fraudulent Prescription Forms and "telephone" prescriptions purportedly issued by the Prescribing Providers, which the Defendants submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "4."

86.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients, and no legitimate reason to

prescribe the Fraudulent Pharmaceuticals using via telephone order or the Fraudulent Prescription Forms. Similarly, the Defendants had no legitimate basis to accept the large volumes of Fraudulent Prescriptions Forms or the purported telephone orders as valid, legitimate prescriptions, regardless of how these prescriptions were characterized.

87.     In other instances, the Defendants purported to dispense the Fraudulent Pharmaceuticals in response to electronic prescriptions, but the prescriptions failed to comply with New York's electronic prescribing laws for multiple reasons (the "Invalid E-Scripts"). For example, Modern Remedies purportedly dispensed the Fraudulent Pharmaceuticals supported only by computer images of prescription forms with the words "Electronic Rx" on the side, and which failed to contain the electronic messaging data associated with genuine, electronic prescriptions transmitted via a valid electronic prescribing system. As further example, Park Chemists 4 Av purportedly dispensed the Fraudulent Pharmaceuticals based on purported electronic prescriptions from physician assistants but many of these electronic prescriptions failed to conform with New York law in that they did not contain the name of the supervising physician. See e.g., 10 NYCRR § 94.2.

88.     Upon information and belief, many, if not all, of the Invalid E-Scripts filled by the Defendants were unauthorized by any practitioner or physician assistant, and/or were not issued with the knowledge of, or any oversight by, a supervising physician. A sample of the Invalid E-Scripts (including the bare forms with the words "Electronic Rx" on the side and electronic prescriptions from physician assistants without the name of the supervising physician) which the Defendants submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "5."

89.     The Defendants facilitated, and accepted, the use of the Fraudulent Prescription Forms, purported telephone orders, and the Invalid E-Scripts in order to exploit the Insureds for financial gain, dispense as many Fraudulent Pharmaceuticals as possible, and maximize their ill-gotten gain as quicky as possible.

C.     **The Prescribing Providers and Clinic Controllers**

90.     In keeping with the fact that the prescriptions were the byproducts of collusive arrangements and fraudulent treatment protocols, the Prescribing Providers and the No-fault Clinics that were the main source of the prescriptions steered to the Pharmacies have been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

91.     Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care. These predetermined protocols almost always involve the rendering and prescribing of medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

92.     For example, Park Chemists 4 Av, Park Chemists, and Modern Remedies billed GEICO more than $1.9 million for Fraudulent Pharmaceuticals they purportedly dispensed based on prescriptions – or purported prescriptions – from multiple physician assistants and nurse practitioners associated with professional corporations purportedly owned by Jonathan Landow, M.D. ("Dr. Landow"), namely Atlantic Medical or its predecessor Macintosh Medical P.C. ("Macintosh Medical"). Dr. Landow and multiple other entities purportedly owned by him,

including Macintosh Medical, were previously sued by GEICO based on allegations that they engaged in a multimillion-dollar fraud scheme involving fraudulent billing and treatment protocols and paying kickbacks to layperson clinic controllers in exchange for access to no-fault patients. See Government Employees Ins. Co. et al v. Landow, et al., 1:21-cv-01440 (NGG)(RER) (E.D.N.Y. 2021).

93.    The physician assistants and nurse practitioners associated with Atlantic Medical and/or Macintosh Medical who were the source of voluminous prescriptions steered to the Pharmacies worked out of multiple No-Fault Clinics, including 137-43 Guy R Brewer Boulevard, Jamaica, New York, 599 Southern Boulevard, Bronx, New York, 3910 Church Avenue, Brooklyn, New York, and 632 Utica Avenue, Brooklyn, New York, among other locations. These No-Fault Clinics provided facilities for a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's No-Fault insurance system.

94.    For example, GEICO has received billing for purported healthcare services from a "revolving door" of more than 45 purportedly different healthcare provider "names" at the clinic located at 137-43 Guy R Brewer Boulevard, Jamaica, New York; more than 40 purportedly different healthcare provider "names" at the clinic located at 599 Southern Boulevard, Bronx, New York; and more than 80 purportedly different healthcare provider "names" at the clinic located at 3910 Church Avenue, Brooklyn, New York ("Church Avenue Clinic"). Not surprisingly, a physician who worked at the Church Avenue Clinic stated under oath that he ended his involvement with the clinic because, among other things, a stamped signature was used to issue referrals and prescriptions that he did not authorize.

95.     Park Chemists 4 Av and Modern Remedies also received numerous prescriptions from Dr. Pak who (i) has a history of professional misconduct, which resulted in discipline in New Jersey and Pennsylvania and (ii) was a named defendant in a federal affirmative action involving a pharmaceutical no-fault scheme wherein it was alleged, among other things, that Dr. Pak issued prescriptions for specifically targeted topical pain products – like Lidocaine 5% Ointment and Diclofenac Gel 3% – that were steered to certain pharmacies pursuant to fraudulent predetermined protocols and illegal collusive arrangements. See Liberty Mutual Ins. Co. et al. v. AVK Rx Inc., et al., Docket No. 2:22-cv-07329 (GRB)(SIL).  Dr. Pak was also a named defendant in another federal affirmative action, which involved the submission of fraudulent prescriptions for durable medical equipment.  See Government Employees Ins. Co. et al. v. Wallegood, Inc. et al., 1:21-cv-01986-PKC-RLM.

96.     Further, Park Chemists and Modern Remedies received numerous prescriptions from John McGee, M.D.("Dr. McGee") – the record owner of Integrated Medical Rehabilitation and Diagnostic, P.C. ("Integrated Medical") – who has a substantial history of healthcare fraud schemes.  In fact, Dr. McGee has been sued multiple times for engaging in no-fault insurance fraud schemes based on allegations that Dr. McGee performed medically unnecessary healthcare services and allowed unlicensed laypersons to illegally exercise ownership and control over a professional corporation and submit fraudulent claims to no-fault insurers.  See State Farm Mutual Automobile Ins. Co. v. McGee et al., 1:10-cv-03848 (PKC)(RML) (E.D.N.Y. 2010); Allstate Ins. Co. et al. v. Ilyaich et al., 1:13-cv-05464 (NG)(LB) (E.D.N.Y. 2013); Allstate Ins. Co. et al. v. Rauch, D.C. et al., 2:22-cv-02424 (JMA)(LGD) (E.D.N.Y. 2022).

## IV. The Fraudulent Topical Pain Products Were Prescribed and Dispensed For Financial Gain and Without Regard to Genuine Patient Care

97.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacies – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacks in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

98.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits.  For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain.  Oral NSAIDs are the most common prescribed analgesic medications worldwide, and their efficacy for treating acute pain is well demonstrated.  If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including muscle relaxers and medications that block neuropathic pain transmission.  Finally, opiates may be prescribed for short-term, limited use.

99.     More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report, which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education

and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

100. Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

101. Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

102. With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs, such as Diclofenac Gel 3% have shown that they are no more effective than a placebo.

103. Despite the guidelines, clinical studies, and the basic goal of helping patients recover in a timely fashion, the Prescribers Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services as part of a predetermined protocol, which lacked any individualized treatment whatsoever. These healthcare services included the premature prescription of excessive and medically unnecessary pharmaceutical drug products, including, and notably, the Fraudulent Topical Pain Products.

104. Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the

Prescribing Providers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

105.     The Prescribing Providers also failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

106.     The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacies was actually used by the patient.

107.     The Prescribing Providers also failed to document in their follow-up examinations whether the Fraudulent Pharmaceuticals dispensed by the Pharmacies provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

### A.     The Fraudulent Lidothol Patch Prescriptions

108.     As part of the scheme by the Defendants to exploit Insureds for financial gain, the Pharmacies routinely dispensed and billed for a topical pain patch that is classified as an "unapproved drug" by the FDA, i.e., the Lidothol Patches, pursuant to duplicitous prescriptions solicited from the Prescribing Providers and the Clinic Controllers, in exchange for kickbacks and other financial incentives.

109.     The Pharmacies billed GEICO more than $776,000.00 for dispensing Lidothol Patches to numerous Insureds, typically billing GEICO between $2,383.80 and $2,984.40 for dispensing a single box of 60 patches.

110. The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

111. The FDA strictly regulates OTC and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

112. The FDA requires every prescription product, whether a brand name or generic drug, to have a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

113. Each NDC for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.

114. The assignment of an NDC to a particular drug product does not indicate that the FDA has verified the information provided, that the product is safe, or that the product is FDA approved.

115. Notably, the FDA categorizes the Lidothol Patches dispensed by the Pharmacies (with NDC code 53225102501) as unapproved drugs.

116. Federal law requires that all new drugs in the U.S. be shown to be safe and effective for their intended use prior to marketing.  Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if healthcare professionals rely on the drug to treat serious medical conditions when there is no FDA-approved drug to treat that condition.  See e.g., https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.  No exception applies to the Lidothol Patches that might allow them to be marketed as prescription drug products.

117.     The FDA also makes it clear that unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality. Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, manufactured in a way that ensures consistent drug quality, or whether their label is complete and accurate.

118.     Nevertheless, the Pharmacies routinely dispensed the unapproved Lidothol Patches, ignoring both the clear FDA categorization of the drug and the Pharmacies' obligations to conduct a prospective drug review before each prescription is dispensed.

119.     Furthermore, all Lidothol Patches dispensed and billed by the Defendants through the Pharmacies were purchased or sourced from Terrain Pharmaceuticals, LLC ("Terrain Pharmaceuticals"). Terrain Pharmaceuticals is not a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, and therefore, is not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale in New York.

120.     No legitimate physician or healthcare provider would regularly issue prescriptions for unapproved drugs like Lidothol Patches, sourced from a company not registered as a drug supplier, manufacturer, or wholesaler with New York State, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any out-of-the-ordinary risk to the patient.

121.     Similarly, no legitimate pharmacy would regularly dispense unapproved drugs like Lidothol Patches, sourced from a company not registered as a drug supplier, manufacturer, or wholesaler with New York State, particularly since the Pharmacies are prohibited from selling drugs that are purchased from drug suppliers not licensed in New York.

122. The Pharmacies, as pharmacies licensed in New York State, are prohibited from holding for sale drugs that are sourced from drug suppliers not licensed in New York, as there is no way to ensure that the drugs were manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

123. To the extent that the Defendants somehow circumvented purchasing the Lidothol Patches directly from an unlicensed supplier, the patches remain unapproved drugs and no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs not reviewed by the FDA.

124. Further, in 2004, the National Association of Boards of Pharmacy ("NABP") established the Verified-Accredited Wholesale Distributors ("VAWD") process in order to ensure and maintain a secure medical supply chain of prescription drug products, among other things. The VAWD accreditation process plays a vital role in preventing counterfeit drugs from entering the US drug supply and thereby, protecting the public from contaminated, counterfeited, or diverted drug products.

125. In order to receive VAWD accreditation, a drug wholesale company must meet several criteria including: (i) complying with all state and federal laws and regulations; (ii) maintaining a legitimate operation; (iii) keeping their license in good standing; (iv) having security measures in place; and (v) employing best practices relating to the handling, storing and shipping prescription drug products.

126. The Pharmacy Owners are responsible for the "proper conduct of the pharmacy" and "for the strength, quality, purity and the labeling thereof of all drugs," as specified in New York Education Law § 6808(e).

127.    Despite the availability of numerous properly licensed and VAWD accredited pharmaceutical suppliers in New York, the Pharmacy Owners consciously purchased – and thereafter dispensed – unapproved Lidothol Patches sourced from an unlicensed and non-accredited supplier, without any regard for the health and safety of patients.

128.    In short, the Defendants obtained prescriptions and dispensed and billed for unapproved drugs (i.e., the Lidothol Patches) through the Pharmacies in predetermined, protocol fashion – without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and accurate labelling – solely to exploit the patients for financial gain, without regard for genuine patient care.

129.    In keeping with the fact that the Lidothol Patches were prescribed and dispensed without regard for patient care and solely for financial gain, the Prescribing Providers' initial examination reports virtually never set forth the medical basis for the prescriptions for Lidothol Patches, while the follow-up examination reports virtually never addressed whether the Lidothol Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

130.    Further, in keeping with the fact that the prescribing and dispensing of the Lidothol Patches had nothing to do with genuine patient care, in many instances the unapproved patches were dispensed early in the treatment cycle contrary to evidence-based guidelines regarding first line therapy for patients for whom medications are clinically appropriate.  For example:

- Insured AV was involved in a motor vehicle accident on October 7, 2022, and subsequently sought treatment with Dr. Pak of Pelham Parkway Medical. On October 10, 2022, AV was prescribed Lidothol Patches, dispensed by Park Chemists 4 Av.  Notably, the prescription of this medication – three days after the accident – is premature in the first instance, in that there are other forms of treatment available to treat individuals purportedly injured in an automobile accident, such as physical therapy and/or well-established oral medications.

- Insured NSDV was involved in a motor vehicle accident on October 7, 2022, and subsequently sought treatment with Dr. Pak of Pelham Parkway Medical. On October 10, 2022, NSDV was prescribed Lidothol Patches, dispensed by Park Chemists 4 Av. Notably, the prescription of this medication – three days after the accident – is premature in the first instance, in that there are other forms of treatment available to treat individuals purportedly injured in an automobile accident, such as physical therapy and/or well-established oral medications.

- Insured SA was involved in a motor vehicle accident on May 15, 2022, and subsequently sought treatment with Vyacheslav Mamanov, NP of ZWH Medical Care PC. On May 16, 2022, SA was prescribed Lidothol Patches, dispensed by Park Chemists 4 Av. Notably, the prescription of this medication – one day after the accident – is premature in the first instance, in that there are other forms of treatment available to treat individuals purportedly injured in an automobile accident, such as physical therapy and/or well-established oral medications.

- Insured EL was involved in a motor vehicle accident on August 25, 2022, and subsequently sought treatment with Dr. Pak of Pelham Parkway Medical. On August 29, 2023, EL was prescribed Lidothol Patches, dispensed by Modern Remedies. Notably, the prescription of this medication – four days after the accident – is premature in the first instance, in that there are other forms of treatment available to treat individuals purportedly injured in an automobile accident, such as physical therapy and/or well-established oral medications.

- Insured RD was involved in a motor vehicle accident on September 30, 2022, and subsequently sought treatment with Dr. Pak of Pelham Parkway Medical. On October 3, 2022, RD was prescribed Lidothol Patches, dispensed by Park Chemists 4 Av. Notably, the prescription of this medication – three days after the accident – is premature in the first instance, in that there are other forms of treatment available to treat individuals purportedly injured in an automobile accident, such as physical therapy and/or well-established oral medications.

These are only representative examples.

### B.     The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions

131.    In addition to the Lidothol Patches, the Pharmacies routinely billed GEICO for Diclofenac Gel 3% and Lidocaine 5% Ointment pursuant to duplicitous prescriptions solicited from the Prescribing Providers and the Clinic Controllers, in exchange for kickbacks and other financial incentives.

132.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Diclofenac Gel 3% because the Defendants could

bill for this pharmaceutical product at exorbitant charges, which egregiously inflated the charges submitted to GEICO and other New York No-Fault insurers.

133.    The Pharmacies billed GEICO more than $1.6 million for dispensing Diclofenac Gel 3% to numerous Insureds, typically billing GEICO between $1,887.14 and $2,363.50 for a single tube of Diclofenac Gel 3%.

134.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks. A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA, and is designed to call attention to serious or life-threatening risks associated with the drug or product.

135.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

136.    Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet. It has not been proven effective for treating strains or sprains.

137.    Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by the Prescribing Providers and dispensed by the Pharmacies, is only FDA approved to treat a skin condition known as actinic keratoses.

138.    Diclofenac Gel 3% has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac Gel 3% to treat musculoskeletal injuries an accepted off-label use.

139.     In keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

140.     In further keeping with the fact that the Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports prepared by the Prescribing Providers virtually never addressed whether the Diclofenac Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patient experienced any side effects.

141.     In addition to the excessive amounts of Diclofenac Gel 3% dispensed by the Pharmacies, in accordance with the fraudulent scheme discussed above, the Defendants routinely billed GEICO – through the Pharmacies – for exorbitantly priced Lidocaine 5% Ointment, pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers, in exchange for kickbacks or other financial incentives.

142.     The Pharmacies billed GEICO nearly $1 million for dispensing Lidocaine 5% Ointment to numerous Insureds, typically billing GEICO between $1,522.00 and $1,909.25 for a single tube of Lidocaine 5% Ointment.

143.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

144.     Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

145.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects, including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypertension, and cardiovascular collapse that may lead to cardiac arrest.  Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

146.     Despite this, the Prescribing Providers never recommended Insureds first use OTC Lidocaine products to treat minor aches and pain which they sustained in fender-bender type motor vehicles accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed those prescriptions to the Pharmacies.

147.     For example, the Prescribing Providers never recommended Insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices around $10.00.

148.     As with the prescriptions for the Diclofenac Gel 3%, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.  Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

149.     In keeping with the fact that Diclofenac Gel 3% and Lidocaine 5% Ointment were prescribed and dispensed pursuant to predetermined treatment protocols and without regard for

patient care, the vast majority of Insureds who received the Fraudulent Pharmaceuticals dispensed by the Pharmacies sustained ordinary soft tissue injuries, such as strains and sprains.

150.    It is well documented that recovery from soft tissue injuries usually takes place within four to six weeks without significant medical intervention. These conditions respond to adjustment of activities, as well as use of ice and heat.  On occasion, use of medications, including NSAID medications, Tylenol, and muscle relaxants are helpful.

151.    Further, each patient that has, or is in, an accident, including motor vehicle accidents, is exposed to a set of unique mechanical events and their injuries are a direct result of those specific forces, hence their injuries are unique. In addition, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

152.    Despite the fact that the Insureds were of different ages, heights, weights, and in different physical conditions, and likely reacted to the accidents in different ways, virtually all of these individuals were unnecessarily prescribed large quantities of Diclofenac Gel 3%, Lidocaine 5% Ointment,  and other Fraudulent Pharmaceuticals in an excessive and systematic manner.

153.    It is extremely improbable that multiple Insureds involved in the same automobile accident would routinely require the same pharmaceutical products. Even so, pursuant to the fraudulent and collusive arrangements, and as demonstrated herein, the Prescribing Providers prescribed, and the Pharmacies dispensed, the same set of Fraudulent Pharmaceuticals to Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care. For example:

- On January 11, 2023, two Insureds – KMC and IP were involved in the same motor vehicle accident. Thereafter, both KMC and IP received, or allegedly received, examinations from a physician assistant and nurse practitioners associated with Atlantic Medical. KMC and IP were in different physical conditions and experienced the impact from different

positions in the vehicle. Nonetheless, KMC and IP were directed to take the same Fraudulent Pharmaceuticals, which were dispensed either by Park Chemists 4 Av or Park Chemists.  In particular:

- o On January 17, 2023, four (4) prescriptions were allegedly issued to KMC by Amira Nasser, PA ("Nasser PA") for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av;

- o On January 17, 2023, four (4) prescriptions were allegedly issued to IP by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av;

- o On February 21, 2023, four (4) prescriptions were allegedly issued to KMC by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

- o On February 21, 2023, four (4) prescriptions were allegedly issued to IP by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

- o On March 21, 2023, two (2) prescriptions were allegedly issued to IP by Nasser PA for Cyclobenzaprine 7.5 mg and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

- o On May 16, 2023, two (2) prescriptions were allegedly issued to IP by Nicola Houslin, NP ("Houslin") for Lidocaine 5% Ointment and Diclofenac Gel 3%, which were dispensed and billed for by Park Chemists; and

- o On May 16, 2023, four (4) prescriptions were allegedly issued to KMC by Houslin NP for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists.

- On January 27, 2023, three Insureds – DG, DWMM, and RAMM were involved in the same motor vehicle accident.  Thereafter, DG, DWMM and RAMM received, or allegedly received, examinations from a physician assistant associated with Atlantic Medical and a doctor associated with another medical practice. DG, DWMM and RAMM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, DG, DWMM and RAMM were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists 4 Av, Park Chemists, and another pharmacy.  In particular:

- o On January 31, 2023, four (4) prescriptions were allegedly issued to DWMM by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av;

- On January 31, 2023, four (4) prescriptions were allegedly issued to RAMM by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av;

- On January 31, 2023, four (4) prescriptions were allegedly issued to DG by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av;

- On February 28, 2023, four (4) prescriptions were allegedly issued to DWMM by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

- On February 28, 2023, four (4) prescriptions were allegedly issued to RAMM by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

- On March 7, 2023, four (4) prescriptions were allegedly issued to DG by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

- On March 17, 2023, three (3) prescriptions were allegedly issued to RAMM by Laxmidhar Diwan, M.D. ("Dr. Diwan") for Lidocaine 5% Ointment, Percocet 5 mg – 325 mg, and Cipro 500 mg, which were dispensed and billed for by eMED Pharmacy Corp.;

- On March 21, 2023, three (3) prescriptions were allegedly issued to DWMM by Dr. Diwan for Lidocaine 5% Ointment, Percocet 5 mg – 325 mg, and Cipro 500 mg, which were dispensed and billed for by eMED Pharmacy Corp.; and

- On March 27, 2023, three (3) prescriptions were allegedly issued to DG by Dr. Diwan for Lidocaine 5% Ointment, Percocet 5 mg – 325 mg, and Cipro 500 mg, which were dispensed and billed for by Caplet Pharmacy Inc.

- On October 31, 2022, two Insureds – NI and RC were involved in the same motor vehicle accident. Thereafter, both NI and RC received, or allegedly received, examinations from a physician assistant associated with Atlantic Medical. NI and RC were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, NI and RC were directed to take the same Fraudulent Pharmaceuticals, which were dispensed either by Park Chemists 4 Av or Park Chemists. In particular:

  - On October 31, 2022, one (1) prescription was allegedly issued to NI by Mario Leon, PA ("Leon PA") for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists 4 Av;

- On October 31, 2022, one (1) prescription was allegedly issued to RC by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists 4 Av;

- On December 8, 2022, one (1) prescription was allegedly issued to NI by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists 4 Av;

- On December 8, 2022, one (1) prescription was allegedly issued to RC by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists 4 Av;

- On March 2, 2023, one (1) prescription was allegedly issued to NI by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists;

- On March 2, 2023, one (1) prescription was allegedly issued to RC by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists;

- On April 6, 2023, one (1) prescription was allegedly issued to NI by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists; and

- On April 6, 2023, one (1) prescription was allegedly issued to RC by Leon PA for Diclofenac Gel 3%, which was dispensed and billed for by Park Chemists.

- On February 26, 2023, two Insureds – RR and AB were involved in the same motor vehicle accident. Thereafter, both RR and AB received, or allegedly received, examinations from a physician assistant associated with Atlantic Medical. RR and AB were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, RR and AB were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists. In particular:

  - On March 3, 2023, four (4) prescriptions were allegedly issued to RR by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

  - On March 3, 2023, four (4) prescriptions were allegedly issued to AB by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists;

  - On April 4, 2023, two (2) prescriptions were allegedly issued to RR by Nasser PA for Lidocaine 5% Ointment and Diclofenac Gel 3%, along with other medications, which were dispensed and billed for by Park Chemists; and

  - On April 19, 2023, two (2) prescriptions were allegedly issued to AB by Nasser PA for Lidocaine 5% Ointment and Diclofenac Gel 3%, which were dispensed and billed for by Park Chemists.

- On October 22, 2022, two Insureds – BD and DD were involved in the same motor vehicle accident. Thereafter, both BD and DD received, or allegedly received, examinations from

a physician assistant associated with Fat Rabbit Orthopedics PLLC. BD and DD were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, BD and DD were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists 4 Av. In particular:

- o On November 9, 2022, one (1) prescription was allegedly issued to BD by Stephan Bouskila, PA ("Bouskila PA") for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av; and

- o On November 9, 2022, one (1) prescription was allegedly issued to DD by Bouskila PA for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av.

- On October 7, 2022, two Insureds – NSDV and AV were involved in the same motor vehicle accident. Thereafter, both NSDV and AV received, or allegedly received, examinations from a doctor associated with Pelham Parkway Medical. NSDV and AV were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, NSDV and AV were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists 4 Av or Modern Remedies. In particular:

- o On October 10, 2022, one (1) prescription was allegedly issued to NSDV by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av;

- o On October 10, 2022, one (1) prescription was allegedly issued to AV by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av;

- o On January 25, 2023, two (2) prescriptions were allegedly issued to NSDV by Dr. Pak for Lidocaine 5% Ointment and Celecoxib 200 mg, which were dispensed and billed for by Modern Remedies; and

- o On January 25, 2023, two (2) prescriptions were allegedly issued to AV by Dr. Pak for Lidocaine 5% Ointment and Celecoxib 200 mg, which were dispensed and billed for by Modern Remedies.

- On December 22, 2022, two Insureds – LM and EIU were involved in the same motor vehicle accident. Thereafter, both LM and EIU received, or allegedly received, examinations from a physician assistant associated with Atlantic Medical. LM and EIU were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, LM and EIU were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists 4 Av and another pharmacy. In particular:

- o On December 27, 2022, four (4) prescriptions were allegedly issued to LM by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5

mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av; and

- On December 27, 2022, four (4) prescriptions were allegedly issued to EIU by Nasser PA for Lidocaine 5% Ointment, Diclofenac Gel 3%, Cyclobenzaprine 7.5 mg, and Naproxen 500 mg, which were dispensed and billed for by Park Chemists 4 Av.

- On November 5, 2022, two Insureds – DV and DV#2 were involved in the same motor vehicle accident. Thereafter, both DV and DV #2 received, or allegedly received, examinations from a physician assistant associated with Atlantic Medical. DV and DV#2 were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, DV and DV#2 were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists 4 Av. In particular:

  - On November 8, 2023, four (4) prescriptions were allegedly issued to DV by Carlotta Ross-Distin PA ("Ross-Distin PA") for Diclofenac Gel 3%, Baclofen 20 mg, Lidocaine 5% Ointment, and Tylenol Extra Strength 500 mg, which were dispensed and billed for by Park Chemists 4 Av; and

  - On November 8, 2023, four (4) prescriptions were allegedly issued to DV#2 by Ross-Distin PA for Diclofenac Gel 3%, Baclofen 20 mg, Lidocaine 5%, and Tylenol Extra Strength 500 mg, which were dispensed and billed for by Park Chemists 4 Av.

- On July 15, 2022, two Insureds – SG and KM were involved in the same motor vehicle accident. Thereafter, both SG and KM received, or allegedly received, examinations from a doctor associated with ACE Emergent Medical Care PC. SG and KM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, SG and KM were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Modern Remedies. In particular:

  - On September 7, 2022, one (1) prescription was allegedly issued to SG by Christian Bannerman, M.D. ("Dr. Bannerman") for Lidothol Patches, which was dispensed and billed for by Modern Remedies; and

  - On September 7, 2022, one (1) prescription was allegedly issued to KM by Dr. Bannerman for Lidothol Patches, which was dispensed and billed for by Modern Remedies.

- On June 25, 2022, three Insureds – LB, BR, and RP were involved in the same motor vehicle accident. Thereafter, LB, BR, and RP received, or allegedly received, examinations from a doctor associated with ACE Emergent Medical Care PC. LB, BR, and RP were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, LB, BR, and RP were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Modern Remedies. In particular:

- o On September 7, 2022, one (1) prescription was allegedly issued to LB by Dr. Bannerman for Lidothol Patches, which was dispensed and billed for by Modern Remedies;

- o On September 7, 2022, one (1) prescription was allegedly issued to BR by Dr. Bannerman for Lidothol Patches, which was dispensed and billed for by Modern Remedies; and

- o On September 7, 2022, one (1) prescription was allegedly issued to RP by Dr. Bannerman for Lidothol Patches, which was dispensed and billed for by Modern Remedies.

- On January 6, 2023, three Insureds – JPL, FPDJ, and Insured RPDJ were involved in the same motor vehicle accident. Thereafter, JPL, FPDJ, and RPDJ received, or allegedly received, examinations from a doctor associated with Integrated Medical. JPL, FPDJ, and RPDJ were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JPL, FPDJ, and RPDJ were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Modern Remedies. In particular:

  - o On January 29, 2023, two (2) prescriptions were allegedly issued to JPL by Dr. McGee for Diclofenac Gel 3% and Lidocaine 5% Ointment, which were dispensed and billed for by Modern Remedies;

  - o On February 10, 2023, two (2) prescriptions were allegedly issued to FPDJ by Dr. McGee for Diclofenac Gel 3% and Lidocaine 5% Ointment, which were dispensed and billed for by Modern Remedies; and

  - o On February 10, 2023, two (2) prescriptions were allegedly issued to RPDJ by Dr. McGee for Diclofenac Gel 3% and Lidocaine 5% Ointment, which were dispensed and billed for by Modern Remedies.

- On October 30, 2022, two Insureds – CD and MA were involved in the same motor vehicle accident. Thereafter, CD and MA received, or allegedly received, examinations from a doctor associated with Integrated Medical. CD and MA were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, CD and MA were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Modern Remedies. In particular:

  - o On November 4, 2022, two (2) prescriptions were allegedly issued to CD by Dr. McGee for Diclofenac Gel 3% and Lidocaine 5% Ointment, which were dispensed and billed for by Modern Remedies;

  - o On November 4, 2022, two (2) prescriptions were allegedly issued to MA by Dr. McGee for Diclofenac Gel 3% and Lidocaine 5% Ointment, which were dispensed and billed for by Modern Remedies;

- On December 9, 2022, refills of the November 4, 2022 prescriptions allegedly issued by Dr. McGee to CD for Diclofenac Gel 3% and Lidocaine 5% Ointment were dispensed and billed for by Modern Remedies; and

- On December 9, 2022, refills of the November 4, 2022 prescriptions allegedly issued by Dr. McGee to MA for Diclofenac Gel 3% and Lidocaine 5% Ointment were dispensed and billed for by Modern Remedies.

- On September 30, 2022, three Insureds – JM, PM, and RD were involved in the same motor vehicle accident. Thereafter, JM, PM, and RD received, or allegedly received, examinations from a doctor associated with Pelham Parkway Medical. JM, PM, and RD were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JM, PM, and RD were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Park Chemists 4 Av, Modern Remedies, and another pharmacy. In particular:

  - On October 3, 2022, one (1) prescription was allegedly issued to JM by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av;

  - On October 3, 2022, one (1) prescription was allegedly issued to PM by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av (though no prescription was submitted by Park Chemists 4 Av to GEICO with its bill);

  - On October 3, 2022, one (1) prescription was allegedly issued to RD by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Park Chemists 4 Av;

  - On November 3, 2022, one (1) prescription was allegedly issued to PM by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Modern Remedies;

  - On November 3, 2022, one (1) prescription was allegedly issued to RD by Dr. Hong Pak, M.D. for Lidothol 4.5-5%, which was dispensed and billed for by Modern Remedies;

  - On November 3, 2022, two (2) prescriptions were allegedly issued to PM by Dr. Pak for Lidocaine 5% Ointment and Celecoxib 200 mg, which were dispensed and billed for by Big Apple Drugs Inc.;

  - On November 3, 2022, two (2) prescriptions were allegedly issued to RD by Dr. Pak for Celecoxib 200 mg and Lidocaine 5% Ointment, which were dispensed and billed for by Big Apple Drugs Inc.;

  - On November 8, 2022 and November 16, 2022, two (2) prescriptions were allegedly issued to JM by Dr. Pak for Celecoxib 200 mg and Lidocaine 5% Ointment, which were dispensed and billed for by Modern Remedies;

o On November 8, 2022, one (1) prescription was allegedly issued to JM by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Big Apple Drugs Inc.;

o On December 7, 2022, one (1) prescription was allegedly issued to JM by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Modern Remedies; and

o On December 7, 2022, one (1) prescription was allegedly issued to RD by Dr. Pak for Lidothol Patches, which was dispensed and billed for by Modern Remedies.

154. Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

155. Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication. See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

156. Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Naproxen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

157. Despite the risks of therapeutic duplication, the Prescribers routinely prescribed, and the Defendants routinely dispensed and billed for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient. For example, in many instances, the Prescribing Providers consciously prescribed and the Defendants consciously dispensed

Diclofenac Gel 3% in conjunction with oral NSAIDs, thereby engaging in therapeutic duplication, while also having simultaneously dispensed other Fraudulent Topical Pain Products such as Lidocaine 5% Ointment, which put the Insureds at higher risk for cardiovascular side effects. For example:

- Insured LM was involved in a motor vehicle accident on December 22, 2022, and subsequently sought treatment with Nasser PA of Atlantic Medical. On December 27, 2022, LM was simultaneously prescribed Diclofenac Gel 3% and Naproxen 500 mg, along with Lidocaine 5% Ointment and Cyclobenzaprine 7.5 mg, dispensed and billed for by Park Chemists 4 Av.

- Insured CR was involved in a motor vehicle accident on March 22, 2023, and subsequently sought treatment with Nasser PA of Atlantic Medical. On March 28, 2023, CR was simultaneously prescribed Diclofenac Gel 3% and Naproxen 500 mg, along with Lidocaine 5% Ointment and Baclofen 10 mg, dispensed and billed for by Park Chemists.

- Insured AP was involved in a motor vehicle accident on February 24, 2023, and subsequently sought treatment with Nasser PA of Atlantic Medical. On February 28, 2023, AP was simultaneously prescribed Diclofenac Gel 3% and Naproxen 500 mg, along with Lidocaine 5% Ointment and Cyclobenzaprine 7.5 mg, dispensed and billed for by Park Chemists.

- Insured EIU was involved in a motor vehicle accident on December 22, 2022, and subsequently sought treatment with Nasser PA of Atlantic Medical. On December 27, 2022, EIU was simultaneously prescribed Diclofenac Gel 3% and Naproxen 500 mg, along with Lidocaine 5% Ointment and Cyclobenzaprine 7.5 mg, dispensed and billed for by Park Chemists 4 Av.

- Insured AB was involved in a motor vehicle accident on February 26, 2023, and subsequently sought treatment with Nasser PA of Atlantic Medical. On March 3, 2023, AB was simultaneously prescribed Diclofenac Gel 3% and Naproxen 500 mg, along with Lidocaine 5% Ointment and Cyclobenzaprine 7.5 mg, dispensed and billed for by Park Chemists.

- Insured RAMM was involved in a motor vehicle accident on January 27, 2023, and subsequently sought treatment with Nasser PA of Atlantic Medical. On January 31, 2023, RAMM was simultaneously prescribed Diclofenac Gel 3% and Naproxen 500 mg, along with Lidocaine 5% Ointment and Cyclobenzaprine 7.5 mg, dispensed and billed for by Park Chemists 4 Av.

These are only representative samples.

158. Prescribing Diclofenac Gel 3%, while simultaneously prescribing or recommending the patient take oral NSAIDS, is therapeutic duplication which results in increased risks with no additional therapeutic benefit.

159. By engaging in therapeutic duplication, the Prescribing Providers and Defendants put patients at increased risk of cardiovascular and gastrointestinal events (without any additional therapeutic benefits) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

160. The manner in which the Insureds were prescribed and dispensed the Fraudulent Pharmaceuticals reflects a protocol driven scheme with little to no relationship to the patients' clinical needs, deviates from the medical standards of care, and demonstrates a gross indifference to patient health and safety.

**V.**     **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribing Providers and Clinic Controllers**

161. New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

162. Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat hundreds of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to the Pharmacies so that the Defendants could bill GEICO huge sums.

163.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

164.    Further, on many occasions, the Defendants and/or Clinic Controllers supplied the Prescribing Providers with Fraudulent Prescription Forms to steer the Prescribing Providers to prescribe Fraudulent Pharmaceuticals and direct those prescriptions to the Pharmacies.

165.    The purpose of the Defendants and/or Clinic Controllers supplying the Prescribing Providers with Fraudulent Prescription Forms was so that the Prescribing Providers could repeatedly issue predetermined and/or medically unnecessary prescriptions for exorbitantly priced Fraudulent Pharmaceuticals that the Pharmacies "specialized" in dispensing in order to exploit the Insureds' No-Fault Benefits.

166.    The Defendants dispensed and billed for the Fraudulent Pharmaceuticals pursuant to large volumes of prescriptions purportedly issued by the Prescribing Providers, notwithstanding that in many instances, there were countless other pharmacies located much closer to the patients' residences.

167. The Prescribing Providers and Clinic Controllers supplied the Defendants with voluminous prescriptions for the Fraudulent Pharmaceuticals in exchange for unlawful kickbacks or other financial incentives.

168. The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

169. The Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care, and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try OTC products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

170. The Prescribing Providers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using Fraudulent Prescription Forms distributed by the Defendants and/or Clinic Controllers, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

171. But for the payment of kickbacks, or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain

Products, or the large volumes of the Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to the Pharmacies.

172. The Defendants, Prescribing Providers, and Clinic Controllers have affirmatively concealed the amounts paid for the kickbacks because such kickbacks are in violation of New York law.

173. Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacies.

174. Upon information and belief, the payment of such kickbacks was made at or near the time the prescriptions were issued.

**VI. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

175. Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

176. Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

177. Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge

no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

178.    For each generic drug (or ingredient included in a compounded product), the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

179.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for the targeted Fraudulent Pharmaceuticals so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceutical products.

180.    The Defendants intentionally targeted the Fraudulent Pharmaceuticals with extremely expensive assigned AWPs or "list prices", in order to inflate the billing submitted through the Pharmacies so as to maximize their profits.

181.    The Pharmacies, however, never actually paid the targeted and egregious AWP of the Fraudulent Pharmaceuticals that they dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

182.    Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved and proven effective.

VII.    **The Defendants' Submission of Fraudulent NF-3 Forms to GEICO**

183.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of the Pharmacies seeking payment for the pharmaceuticals for which the Pharmacies are ineligible to receive payment.

184. These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii) The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives;

(iii) The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

(iv) The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

**VIII.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

185.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

186.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

187.   Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

188.   As part of their fraudulent scheme, the Defendants billed for the Fraudulent Pharmaceuticals through three separate pharmacies to reduce the amount of billing submitted under any individual name and any one tax identification number.

189.   Likewise, the Defendants billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee, and further billed for multiple drug products, including oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

190.   The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

191.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacies have been engaged in fraud.

192.     The Defendants' collection efforts through numerous, separate no-fault collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients across numerous different No-Fault Clinics.

193.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO also ensures that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

194.     The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $136,300.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $408,000.00.

195.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

# THE FIRST CLAIM FOR RELIEF
## Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

197.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $3,175,200.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through the Pharmacies, specifically $1,468,237.40 in fraudulent billing submitted under the name of Park Chemists 4 Av, $520,589.03 in fraudulent billing submitted under the name of Park Chemists, and $1,186,470.57 in fraudulent billing submitted under the name of Modern Remedies.

198.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacies billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

199.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives.

200.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the

Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

201.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid and duplicitous prescriptions.

202.    The Defendants, including Park Chemists 4 Av, Park Chemists, and Modern Remedies, violated New York State regulatory and licensing requirements, rendering the pharmacies ineligible to receive reimbursement for No-Fault Benefits.

203.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through the Pharmacies.

**THE SECOND CLAIM FOR RELEIF**
**Against G. Valevich, I. Valevich, Kohanbash, and Levihaiem**
**(Violation of 18 U.S.C. § 1962(c))**

204.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

205.    Park Chemists 4 Av, Park Chemists, and Modern Remedies constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

206.    The members of the Pharmacy Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision

making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Park Chemists 4 Av, Park Chemists, and Modern Remedies ostensibly are independent entities – with different names and tax identification numbers – that were created and/or operated as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers. The Pharmacy Enterprise has operated under several separate entity names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one pharmacy. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Pharmacy Enterprise acting individually or without the aid of each other.

207.    The Pharmacy Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by employing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO), by preparing and filing applications and documents in order to obtain licenses and registrations necessary to operate as pharmacies in New York State, by creating and maintaining patient files and other records, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments, by selecting and purchasing the targeted Fraudulent Pharmaceuticals from wholesalers, by coordinating the fraudulent scheme with various Prescriber Providers and Clinic Controllers operating at multiple No-Fault Clinics including obtaining prescriptions from them and delivering the Fraudulent Pharmaceuticals to them to dispense to Insureds, by engaging in funding arrangements and facilitating payments in connection with the illegal kickback arrangements, and by retaining

collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

208.    G. Valevich, I. Valevich, Kohanbash, Levihaiem (i.e., the Pharmacy Owners) were employed by and/or associated with the Pharmacy Enterprise and knowingly conducted and/or participated, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that the Pharmacy Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid and duplicitous prescriptions.

209.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1"-"3." Each such mailing was made in furtherance of the mail fraud scheme.

210.    The Pharmacy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges.  The predicate acts of mail fraud are the regular way in which the Pharmacy Owners operate the Pharmacy Enterprise and acts of mail fraud therefore are essential for the Pharmacy Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud, including the submission of claims under multiple TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Pharmacy Enterprise to the present day.

211.    The Pharmacy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO (and likely other automobile insurers). These inherently unlawful acts are taken by the Pharmacy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO (and likely other automobile insurers) through fraudulent no-fault billing.

212.    GEICO has been injured in its business and property by reason of the above-described conduct in that they have paid at least $136,300.00 pursuant to the fraudulent bills submitted by the Pharmacy Owners through the Pharmacy Enterprise.

213.    By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against G. Valevich, I. Valevich, Kohanbash, Levihaiem and**
**the John Doe Defendants**
**(Violation of 18 U.S.C. § 1962(d))**

214. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

215. G. Valevich, I. Valevich, Kohanbash, Levihaiem and the John Doe Defendants knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs, through a through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that the Pharmacy Enterprise was not eligible to receive because: (i) the billed-for pharmaceuticals were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid and duplicitous prescriptions.

216. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1"–"3." Each such mailing was made in furtherance of the mail fraud scheme.

217.    G. Valevich, I. Valevich, Kohanbash, Levihaiem and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

218.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $136,300.00 pursuant to the fraudulent bills submitted through the Pharmacy Enterprise.

219.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against G. Valevich and I. Valevich
### (Violation of RICO, 18 U.S.C. § 1962(c))

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

221.    Park Chemists 4 Av is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

222.    G. Valevich and I. Valevich knowingly conducted and/or participated, directly or indirectly, in the conduct of Park Chemists 4 Av's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Park Chemists 4 Av was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for

financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Park Chemists 4 Av in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Park Chemists 4 Av to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

223.    Park Chemists 4 Av's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which G. Valevich and I. Valevich operated Park Chemists 4 Av, inasmuch as Park Chemists 4 Av never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Park Chemists 4 Av to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Park Chemists 4 Av to the present day.

224.    Park Chemists 4 Av is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed

solely to financially enrich the Defendants. These inherently unlawful acts are taken by Park Chemists 4 Av in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

225. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $54,202.03 pursuant to the fraudulent bills submitted by the Defendants through Park Chemists 4 Av.

226. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE FIFTH CLAIM FOR RELIEF**
**Against G. Valevich, I. Valevich and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

227. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

228. Park Chemists 4 Av is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

229. G. Valevich, I. Valevich and the John Doe Defendants are employed by or associated with the Park Chemists 4 Av enterprise.

230. G. Valevich, I. Valevich and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Park Chemists 4 Av's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Park Chemists 4 Av was not eligible to receive under the New York

no-fault insurance laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Park Chemists 4 Av in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

231.    G. Valevich, I. Valevich  and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

232.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $54,202.03 pursuant to the fraudulent bills submitted by the Defendants through Park Chemists 4 Av.

233.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE SIXTH CLAIM FOR RELIEF
### Against Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants
### (Common Law Fraud)

234.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

235.     Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Park Chemists 4 Av.

236.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceuticals were medically necessary and properly billed when in fact the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Park Chemists 4 Av acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Park Chemists 4 Av in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Park Chemists 4 Av acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally

targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) in every claim, the representation that Park Chemists 4 Av acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

237.  Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Park Chemists 4 Av that were not compensable under the No-Fault Laws.

238.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $54,202.03 pursuant to the fraudulent bills submitted, or caused to be submitted, by Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants through Park Chemists 4 Av.

239.  Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

240.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE SEVENTH CLAIM FOR RELIEF
### Against Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants
### (Unjust Enrichment)

241.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

242.    As set forth above, Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

243.    When GEICO paid the bills and charges submitted by or on behalf of Park Chemists 4 Av for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants' improper, unlawful, and/or unjust acts.

244.    Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

245.    Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

246.    By reason of the above, Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $54,202.03.

**THE EIGHTH CLAIM FOR RELIEF**
**Against G. Valevich and I. Valevich**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

247.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

248.     Park Chemists is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

249.     G. Valevich and I. Valevich knowingly conducted and/or participated, directly or indirectly, in the conduct of Park Chemists' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Park Chemists was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Park Chemists in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Park Chemists to GEICO that

comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

250.     Park Chemists' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which G. Valevich and I. Valevich operated Park Chemists, inasmuch as Park Chemists never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Park Chemists to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Park Chemists to the present day.

251.     Park Chemists is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants.  These inherently unlawful acts are taken by Park Chemists in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

252.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $24,023.50 pursuant to the fraudulent bills submitted by the Defendants through Park Chemists.

253.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE NINTH CLAIM FOR RELIEF
### Against G. Valevich, I. Valevich and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

254.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

255.     Park Chemists is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

256.     G. Valevich, I. Valevich and the John Doe Defendants are employed by or associated with the Park Chemists enterprise.

257.     G. Valevich, I. Valevich and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Park Chemists' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Park Chemists was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Park Chemists in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for

pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

258.     G. Valevich, I. Valevich and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

259.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $24,023.50 pursuant to the fraudulent bills submitted by the Defendants through Park Chemists.

260.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THE TENTH CLAIM FOR RELIEF
**Against Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants**
**(Common Law Fraud)**

261.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

262.     Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Park Chemists.

263. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceuticals were medically necessary and properly billed when in fact the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Park Chemists acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Park Chemists in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Park Chemists acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) in every claim, the representation that Park Chemists acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

264. Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a

calculated effort to induce GEICO to pay charges submitted through Park Chemists that were not compensable under the No-Fault Laws.

265.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $24,023.50 pursuant to the fraudulent bills submitted, or caused to be submitted, by Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants through Park Chemists.

266.    Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

267.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE ELEVENTH CLAIM FOR RELIEF
### Against Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants
### (Unjust Enrichment)

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

269.    As set forth above, Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

270.    When GEICO paid the bills and charges submitted by or on behalf of Park Chemists for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants' improper, unlawful, and/or unjust acts.

271. Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

272. Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

273. By reason of the above, Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $24,023.50.

### THE TWELFTH CLAIM FOR RELIEF
**Against Kohanbash and Levihaiem**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

274. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

275. Modern Remedies is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

276. Kohanbash and Levihaiem knowingly conducted and/or participated, directly or indirectly, in the conduct of Modern Remedies' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Modern Remedies was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for

financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Modern Remedies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Modern Remedies to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

277.     Modern Remedies' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kohanbash and Levihaiem operated Modern Remedies, inasmuch as Modern Remedies never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Modern Remedies to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Modern Remedies to the present day.

278.     Modern Remedies is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed

solely to financially enrich the Defendants. These inherently unlawful acts are taken by Modern Remedies in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

279.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $58,080.83 pursuant to the fraudulent bills submitted by the Defendants through Modern Remedies.

280.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRTEENTH CLAIM FOR RELIEF**
**Against Kohanbash, Levihaiem and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

281.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

282.     Modern Remedies is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

283.     Kohanbash, Levihaiem and the John Doe Defendants are employed by or associated with the Modern Remedies enterprise.

284.     Kohanbash, Levihaiem and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Modern Remedies' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Modern Remedies was not eligible to receive under the New York no-

fault insurance laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Modern Remedies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

285.     Kohanbash, Levihaiem and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

286.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,080.83 pursuant to the fraudulent bills submitted by the Defendants through Modern Remedies.

287.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE FOURTEENTH CLAIM FOR RELIEF
### Against Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants
### (Common Law Fraud)

288.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

289.     Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Modern Remedies.

290.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceuticals were medically necessary and properly billed when in fact the billed-for pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Modern Remedies acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Modern Remedies in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Modern Remedies acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they could dispense in

large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) in every claim, the representation that Modern Remedies acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceuticals were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

291.     Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Modern Remedies that were not compensable under the No-Fault Laws.

292.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $58,080.83 pursuant to the fraudulent bills submitted, or caused to be submitted, by Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants through Modern Remedies.

293.     Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

294.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTEENTH CLAIM FOR RELIEF
### Against Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants
### (Unjust Enrichment)

295.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

296.     As set forth above, Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

297.     When GEICO paid the bills and charges submitted by or on behalf of Modern Remedies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants' improper, unlawful, and/or unjust acts.

298.     Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

299.     Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

300.     By reason of the above, Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $58,080.83.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Pharmacies have no right to receive payment for any pending bills, amounting to approximately $3,175,200.00 submitted to GEICO;

B.      On the Second Claim For Relief against G. Valevich, I. Valevich, Kohanbash, and Levihaiem, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $136,300.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim For Relief against G. Valevich, I. Valevich, Kohanbash, Levihaiem, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $136,300.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim for Relief against G. Valevich and I. Valevich, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $54,202.03, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Claim for Relief against G. Valevich, I. Valevich, and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $54,202.03, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.	On the Sixth Claim for Relief against Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $54,202.03, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.	On the Seventh Claim for Relief against Park Chemists 4 Av, G. Valevich, I. Valevich and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $54,202.03, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.	On the Eighth Claim for Relief against G. Valevich and I. Valevich, a recovery in favor of GEICO in an amount to be determined at trial but approximately $24,023.50, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.	On the Ninth Claim for Relief against G. Valevich, I. Valevich and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $24,023.50, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.	On the Tenth Claim for Relief against Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $24,023.50, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.	On the Eleventh Claim for Relief against Park Chemists, G. Valevich, I. Valevich and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial

but approximately $24,023.50, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L. On the Twelfth Claim for Relief against Kohanbash and Levihaiem, a recovery in favor of GEICO in an amount to be determined at trial but approximately $58,080.83, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M. On the Thirteenth Claim for Relief against Kohanbash, Levihaiem and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $58,080.83, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N. On the Fourteenth Claim for Relief against Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $58,080.83, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

O. On the Fifteenth Claim for Relief against Modern Remedies, Kohanbash, Levihaiem and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $58,080.83, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
December 14, 2023

RIVKIN RADLER LLP


By: ___/s/ *Michael A. Sirignano*___

      Michael A. Sirignano
      Barry I. Levy
      Jennifer Abreu
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*